## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### Southern Division

|  |  |  |
|---|---|---|
| **GLAXOSMITHKLINE, LLC,** | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | |
| **v.** | * | Case No.: 8:22-cv-00364-PWG |
| | * | |
| **DENISE BROOKS** | * | |
| | * | |
| **Defendant.** | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

### MEMORANDUM OPINION

This Memorandum Opinion addresses Plaintiff GlaxoSmithKline, LLC's ("GSK") Motion for Temporary Restraining Order, ECF No. 2, against Defendant Denise Brooks. For the reasons identified in this Memorandum Opinion, GSK's Motion is GRANTED.

### BACKGROUND

Plaintiff GSK describes itself as a "global healthcare company that engages in research and development, manufacturing, and distribution of pharmaceuticals, vaccines, and other healthcare products." ECF 1, Compl. ¶ 9[1]. GSK has "developed, implemented, and maintained standard manufacturing processes and procedures, which are intended for internal use only and subject to

---

[1]      The Allegations in the Complaint referenced in this Memorandum and Order are supported by two Declarations submitted under penalty of perjury: The Declaration of Mr. Allen Moss, GSK Vice President of Quality Audit and Compliance, ECF 1, Ex. A, and the Declaration of Mr. Chad McDonnell, of the Forensic Evaluations firm FIT, ECF 1, Ex. D. Counsel for GSK have certified that they have provided notice of this action and Motion for a TRO to counsel for the Defendant, on February 11, 2022, ECF No. 2 at p. 21 (page reference referring to ECF page number).

reasonable measures to protect their confidentiality from competitors and other persons, as well as proprietary manufacturing processes and instructions for the manufacture of drugs." *Id.* ¶ 11. GSK characterizes these "processes, procedures, and instructions" as "Trade Secrets and Confidential Information," and alleges that it "takes precautions to prevent GSK Trade Secrets and Confidential Information from falling into the hands of competitors and other persons who would use the information to their benefit and to GSK's detriment." *Id.* ¶ 12.

Defendant Denise Brooks was employed at GSK's biopharma manufacturing facility in Rockville, Maryland, from November 2006 until her resignation on January 13, 2022. *Id.* ¶¶ 10, 13. As a "Quality Systems Lead," Ms. Brooks "had access to and possession of GSK Trade Secrets and Confidential Information," including but not limited to information about GSK's manufacturing procedures and regulatory compliance. *Id.* ¶ 14, 16.

In late 2021, GSK began investigating "the propriety of payments to an external vendor that had been charged to [Ms.] Brooks'[s] GSK-issued credit card and reimbursed by GSK." *Id.* ¶ 17. Ms. Brooks agreed to participate in GSK's HEAR Program (Helping Employees Achieve Resolution of Workplace Concerns) program in connection with the investigation, and is therefore "bound by the HEAR Legal Agreement, which requires arbitration of claims relating to the employee's employment." Compl. ¶¶ 19–20. Ms. Brooks resigned before the investigation was complete. *Id.* ¶¶ 17–20.

GSK alleges that on January 12, 2022, Ms. Brooks coordinated with GSK's IT department to exchange her old company-issued laptop for a new one. Compl. ¶ 21. Early the following morning, Ms. Brooks emailed her supervisor to announce her immediate resignation and stated she would return "all GSK equipment," as required by GSK policy. *See* Compl. Exhibit B at 15. Later that afternoon, GSK alleges that closed circuit cameras captured Ms. Brooks using her access

badge to get into the Rockville facility, and then walking back out "carrying several items" approximately ten minutes later. Compl. ¶ 24–25. GSK alleges that Ms. Brooks then reentered the building and went to the IT area where, instead of returning her old GSK-issued laptop, she exchanged it for a new GSK-laptop (the "ZBook") as arranged prior to her resignation. *Id.* ¶ 26. Because IT was unaware of Ms. Brooks's resignation, it followed standard procedure an "uploaded [Ms.] Brooks'[s] OneDrive profile onto the ZBook, which created local copies on the ZBook of the same files that had been saved on the old laptop locally." *Id.* at 27, 29.[2] Ms. Brooks then allegedly "signed onto her GSK-owned Microsoft Outlook email account to confirm that it had been loaded onto the ZBook," which resulted in "copies of Brooks' emails – including older emails and any emails that she received before termination of her access" being saved locally to the ZBook. *Id.* ¶ 30. GSK alleges that closed-circuit camera footage shows Ms. Brooks leaving the Rockville facility with the new ZBook and her access badge. *Id.* ¶ 34. Additionally, GSK alleges that Ms. Brooks emailed documents containing GSK Trade Secrets and Confidential Information to her personal email address in the days before and after her resignation, and that she transferred documents from her GSK laptop to multiple external storage devices. *Id.* ¶¶ 35–36.

GSK retained a computer forensics consultant to help it ascertain the specifics of Ms. Brooks's "removal, access, and use of GSK Trade Secrets and Confidential Information." Compl. ¶ 37. Informed by that consultation, GSK now believes Ms. Brooks has the following information in her possession:

- GSK manufacturing processes and steps;

---

[2]     GSK explains that employees' OneDrive profiles "contain virtually all of the documents and data that GSK employees create, modify, and store in the performance of their duties, including but not limited to word processing files, data spreadsheets, portable document format ("PDF") files, visual media files, presentations, notes, and other files supported by software applications. Compl. ¶ 28.

- GSK standard operating procedures;
- information about highly confidential matters within GSK related to corporate governance and issues pertaining to GSK's corporate structure;
- confidential training materials regarding GSK's internal employee training programs;
- strategic business plans; and
- a GSK-developed, proprietary process, and part of its Quality Management System, which supports how GSK ensures the consistent operation of its manufacturing activities in compliance with regulatory requirements.

*Id.* ¶¶ 40–41; Compl. at Exhibit A and D.

GSK has made multiple and varied attempts to recover the information and equipment that Ms. Brooks allegedly took. Compl. ¶¶ 42–50; Compl. at Exhibits F–H. GSK sent Ms. Brooks multiple letters and text messages, and GSK's counsel sent her another letter by email and courier. *Id.* Ms. Brooks responded to GSK's counsel's email indicating she would contact them, but never did despite several attempts by GSK's counsel to follow up. *Id.* On February 1, 2022, Ms. Brooks informed GSK that she had secured counsel, but did not provide any contact information for her attorney when it was requested. *Id.* Ms. Brooks's counsel ultimately contacted GSK's on February 10, 2022, but GSK alleges that Ms. Brooks's counsel "declined to have a substantive discussion about the dispute at that time and did not respond to subsequent emails and a voicemail from counsel for GSK. *Id.*

GSK filed this action for emergency injunctive relief on February 11, 2022. In it, GSK asserts one count of Misappropriation of Trade Secrets under the federal Defend Trade Secrets Act (18 U.S.C. § 1831, *et seq.*) ("DTSA"); one count of Misappropriation of Trade Secrets under the Maryland Uniform Trade Secrets Act (Md. Code, Commercial Law Article § 11-1201 *et seq.*) ("MUTSA"); one count of conversion; and one count of detinue/replevin. *See generally*, Compl.

GSK now asks the Court to issue a TRO ordering Ms. Brooks: (1) to refrain from accessing, using, or disclosing any of GSK's confidential information or data; (2) to immediately return all GSK property; (3) to refrain from deleting any GSK-owned media, documents, or data; (4) to provide proof that she deleted any documents she took from GSK's internal network by submitting a third-party inspection of her electronic storage; and (5) to preserve documents that are relevant to this action. ECF 2-2, Proposed TRO.

## DISCUSSION

The purpose of a preliminary injunction or a temporary restraining order ("TRO") is to "protect the status quo and to prevent irreparable harm during the pendency of a lawsuit, ultimately to preserve the court's ability to render a meaningful judgment on the merits." *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 525 (4th Cir. 2003). A preliminary injunction is distinguished from a TRO only by the difference in notice to the nonmoving party and by the duration of the injunction. *U.S. Dep't of Labor v. Wolf Run Mining Co.*, 452 F.3d 275, 281 n.1 (4th Cir. 2006) (comparing Fed. R. Civ. P. 65(a) with Fed. R. Civ. P. 65(b)). Notice is not required for a TRO, but the moving party's attorney, or the movant himself, in the case of a *pro se* party, must "certif[y] in writing any efforts made to give notice and the reasons why it should not be required." Fed. R. Civ. P. 65(b)(1)(B). Moreover, the moving party must "clearly show" by "specific facts in an affidavit or verified complaint" that "immediate and irreparable injury, loss or damage will result to the movant before the adverse party can be heard in opposition." Fed. R. Civ. P. 65(b)(1)(A).

To obtain a TRO, the plaintiff must "establish that [1] he is likely to succeed on the merits, [2] he is likely to suffer irreparable harm in the absence of preliminary relief, [3] the balance of equities tips in his favor, and [4] an injunction is in the public interest." *Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 20 (2008); *see Dewhurst v. Century Aluminum Co.*, 649 F.3d

287, 290 (4th Cir. 2011). Because a TRO is "an extraordinary remedy... [it] may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22.

Prior to 2009, the Fourth Circuit followed a "balance of hardship" approach to preliminary injunctions considering all four *Winter* factors, but "allowed[ing] each requirement to be conditionally redefined" in a "flexible interplay" depending on how the other requirements were met. *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 347 (4th Cir. 2009) (citing *Blackwelder Furniture Co. of Statesville v. Seilig Manufacturing Co.*, 550 F.2d 189, 196 (4th Cir. 1977)). However, *Real Truth* invalidated this approach, and it "may no longer be applied" in the Fourth Circuit. *Id.* As a result, the plaintiff must satisfy each requirement as articulated. *Id.*

For the reasons explained below, I find that GSK has met its burden with regard to the four *Winter* factors, and that granting its Motion for a TRO is appropriate.

## I. Clear showing of the likelihood of success on the merits

To meet the first requirement, the plaintiff must "clearly demonstrate that he will *likely succeed* on the merits," rather than present a mere "grave or serious question for litigation." *Id.* at 346–47 (emphasis from the original). Simply "providing sufficient factual allegations to meet the [Fed. R. Civ. P.] 12(b)(6) standard of *Twombly* and *Iqbal*" does not meet the rigorous standard required under the *Winter* and *Real Truth* decisions. *Allstate Ins. Co. v. Warns*, No. CCB-11-1846, 2012 WL 681792, at *14 (D. Md. Feb. 29, 2012).

GSK must prove similar elements to prevail on its claims under DTSA and MUTSA:

> As relevant here, the [DTSA] provides that a trade secret can be misappropriated "when a person either (1) acquires a trade secret while knowing, or having reason to know, that the trade secret was acquired by improper means, 18 U.S.C. § 1839(5)(A), or (2) uses or discloses the trade secret after acquiring it through improper means, *id.* § 1839(5)(B)(i). Maryland defines misappropriation in substantially the same manner. *Compare* Md. Code Ann., Com. Law § 11-1201(c) *with* 18 U.S.C. § 1839(5). Thus, a claim for misappropriation lies "simply

by demonstrating that the defendant acquired [the] trade secret by improper means, even if the plaintiff cannot show use of that trade secret." *Sys. 4, Inc. v. Landis & Gyr, Inc.*, 8 F. App'x 196, 200 (4th Cir. 2001) (interpreting the MUTSA). The DTSA further provides that the "improper means" of acquiring a trade secret "includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." 18 U.S.C. § 1839(6)(A). The MUTSA's definition mirrors the DTSA's definition.

*Brightview Grp., LP v. Teeters*, 441 F. Supp. 3d 115, 132 (D. Md. 2020).

GSK has demonstrated that it is likely to succeed on the merits of its misappropriation claims. GSK alleges that Ms. Brooks had access during the course of her employment to a wide range of documents containing information constituting trade secrets,[3] including information regarding GSK's confidential business practices, scientific developments, and manufacturing processes. GSK also alleges that Ms. Brooks improperly obtained copies of those materials, which she was aware were intended to be kept confidential, over a period of days both before and after she resigned. Ms. Brooks's alleged conduct likely violated GSK's policies requiring employees to maintain confidentiality, as well as its requirement for departing employees to return all GSK property. Finally, GSK alleges that Ms. Brooks has refused to engage with GSK's repeated requests to resolve this issue. GSK's allegations are supported by the Exhibits attached to its Complaint, including the declarations of Allen Moss and Chad McDonnel, submitted under penalty of perjury. *See* Fed. R. Civ. P. 65(b)(1)(A). Thus, I conclude that GSK has successfully demonstrated that it is likely to succeed on its misappropriation claims.

---

[3]    DTSA defines "Trade Secret" as "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if-- (A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information[.]" 18 U.S.C.A. § 1839(3).

**II. Likelihood of irreparable harm in the absence of preliminary relief**

Even when a plaintiff clearly demonstrates a likelihood of success on the merits, the plaintiff still must show irreparable harm. *Real Truth*, 575 F.3d at 346. To analyze this element, the court must determine whether [1] plaintiff is suffering actual and imminent harm, not just a mere possibility, and [2] whether that harm is truly irreparable, or whether it can be remedied at a later time with money damages. *See Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 811 (4th Cir. 1991). *See also Sterling Commercial Credit—Mich., LLC v. Phoenix Indus. I, LLC*, 762 F. Supp. 2d 8, 14–15 (D.D.C. 2011) ("First, the injury must be both certain and great; it must be actual and not theoretical.... Second, the injury must be beyond remediation."). Harm that can be remedied by future money damages is not irreparable. *Brightview*, 441 F. Supp. at 137. "Courts have recognized that the potential for the loss of trade secrets . . . demonstrates irreparable harm because a trade secret once lost is, of course, lost forever." *Teksystems, Inc. v. Spotswood*, No. CV RDB 05-1532, 2005 WL 8174397, at *5 (D. Md. June 29, 2005). "When the failure to grant preliminary relief creates the possibility of permanent loss of customers to a competitor or the loss of goodwill, the irreparable harm injury prong is satisfied." *Id.*

The confidential information allegedly misappropriated by Ms. Brooks, such as information regarding GSK's manufacturing processes, could have a potentially devastating impact on GSK's business in the hands of a competitor. And the resulting damages cannot begin to be quantified because its effects might be wide-ranging and permanent. For those reasons, I conclude GSK has sufficiently alleged a risk of irreparable harm in the absence of preliminary relief.

### III. The public interest

When an injunction will "adversely affect a public interest... the court may... withhold relief until a final determination of the rights of the parties, though the postponement may be burdensome to the plaintiff." *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 312–13 (1982). In fact, "courts... should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id.* at 312.

Granting GSK the relief it seeks poses no obvious adverse consequences to the public. To the contrary, "the public interest favors the protection of trade secrets, and the prevention of unfair business practices." *Brightview Grp., LP v. Teeters*, 441 F. Supp. 3d 115, 142 (D. Md. 2020). Accordingly, I conclude that GSK's requested TRO is in the public interest.

### IV. The balancing of equities

Finally, the balance of equities must tip in favor of the movant in order for a TRO or preliminary injunction to be granted. *Winter*, 555 U.S. at 20. Not only must courts weigh any potential harm to the nonmoving party, but also the chance of harm to any interested person, as well as any potential harm to the public. *Continental Group Inc. v. Amoco Chems. Corp.*, 614 F.2d 351, 356–57 (3d Cir. 1980) (citing *Delaware River Port Authority v. Transamerican Trailer Transport, Inc.*, 501 F.2d 917, 924 (3d Cir. 1974)).

GSK asks in the main for its data and its physical property to be preserved, protected, and returned in one piece. ECF 2-2, Proposed TRO. I agree with GSK that those demands cause no articulable injury to Ms. Brooks. And while I am mindful that GSK's request for Ms. Brooks to prove that she has complied with those demands by submitting the electronics and cloud-storage that for third-party examination implicates Ms. Brooks's privacy, the request is limited in scope to those devices used "to copy or transfer GSK Trade Secrets and Confidential Information," and I

conclude that the intrusion does not outweigh GSK's interest in confirming that any misappropriated data has been removed from Ms. Brooks's personal accounts and devices. *Id.*

**V. Notice of Motion for a TRO**

Counsel for GSK have certified that they gave notice of the filing of this action and Motion for a TRO to Christina J. Bostick, counsel for the Defendant, on February 11, 2022. To date, no appearance has been entered by Ms. Bostick on behalf of the Defendant.

## CONCLUSION

GSK'S Motion for a TRO is GRANTED. The Court has set a scheduling conference to discuss further proceedings in this case for Wednesday, February 16, 2022 at 11:30 AM. Further, a hearing has been tentatively set for Monday, February 28, 2022 from 11:00 AM to 3:00 PM.

A separate Order shall be issued concurrently with this Memorandum Opinion.

Dated: <u>February 15, 2022</u>
   10:30 AM

/s/
Paul W. Grimm
United States District Judge